**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Craig Webster,

Plaintiff,

v.

PHI Health LLC,

Defendant.

No. CV-25-08199-PCT-DWL

**ORDER**

In this action, Craig Webster ("Plaintiff"), a Native American and enrolled member of the White Mountain Apache Tribe, alleges that his employer, PHI Health LLC d/b/a PHI Air Medical ("Defendant"), discriminated against him based on his race/national origin/ancestry, subjected him to a hostile work environment, and retaliated against him for his reporting of the discrimination and hostile work environment.

Now pending before the Court is Defendant's motion to dismiss. (Doc. 16.) For the reasons that follow, the motion is denied.

**BACKGROUND**

I. Factual Background

The following facts, presumed true, are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC"). (Doc. 8.)

A. **Plaintiff And His Employment With Defendant**

Plaintiff "is an adult male resident of the State of Arizona" whose "race and/or national origin and/or ancestry is Native American and he is an enrolled member of the

White Mountain Apache Tribe." (*Id.* ¶ 4.) "At all relevant times . . . , [Defendant] knew and knows that [Plaintiff's] race and/or national origin and/or ancestry is Native American and that he is an enrolled member of the White Mountain Apache Tribe." (*Id.*)

On or about December 27, 2021, Defendant hired Plaintiff. (*Id.* ¶ 11.) Plaintiff has been, and continues to be, employed by Defendant as a Flight Paramedic. (*Id.* ¶ 12. *See also id.* ¶ 4.) In that position, Plaintiff "has consistently taken on additional responsibilities, and he has received consistently high performance reviews." (*Id.* ¶ 12.)

From on or about December 27, 2021 through in or around January or February 2024, Plaintiff "work[ed] primarily out of [Defendant's] Show Low, Arizona Base ('Show Low Base')," and from in or around January or February 2024 through the present, Plaintiff "work[ed] primarily out of [Defendant's] Safford, Arizona Bases ('Safford Bases')." (*Id.* ¶ 4.) "At the Show Low Base, approximately 60% of the patient care calls came from Native American Reservations." (*Id.* ¶ 14.) "At the Safford Bases, approximately 50% of the patient care calls have come from Native American Reservations, until in or around January 2025 when that number began to drop." (*Id.*)

Plaintiff "is one of three Native American employees working for [Defendant] in Arizona." (*Id.* ¶ 13.) The FAC alleges that "[s]ince he began his employment . . . , and continuing through the present, [Plaintiff] has been subjected to pervasive discrimination and hostile work environment because of his Native American race, national origin, and/or ancestry" and "has also observed [Defendant's] policy and practice of a lack of cultural empathy and inclusivity, and discrimination, toward Native American communities, which has added to the hostile and discriminatory work environment he experiences at [Defendant] as a Native American." (*Id.* ¶¶ 15-16.)

B. **The Hair Cutting Incident**

"When [Defendant] hired [Plaintiff], [Defendant's] Human Resources directed [Plaintiff] to cut his hair under order from [Defendant's] Chief Executive Officer, David Motzkin, despite [Plaintiff's] adherence to company grooming standards." (*Id.* ¶ 17.) Defendant "only dropped its directive for [Plaintiff] to cut his hair after [Plaintiff] and his

New Hire Educators reported their concerns and [Plaintiff's] adherence to company grooming standards to Human Resources." (*Id.* ¶ 18.)

C. **Grief Counselors**

Defendant "provides all clinical care providers with a grief counselor upon request, except for [Plaintiff]." (*Id.* ¶ 19.) Plaintiff "has requested a grief counselor like other, similarly situated, non-Native American clinical care providers receive upon request, or even without a request, but he has not received one." (*Id.*)

"For example, after a particularly bad patient critical care call in the Spring of 2024, [Plaintiff] tried to reach a grief counselor through the designated [Defendant] helpline, but he could not reach one." (*Id.* ¶ 20.) Plaintiff "reported his frustrations to his direct supervisor, but he never heard back from anyone." (*Id.*)

"By way of additional example, after another particularly bad patient critical care call in or around the Fall of 2024, [Plaintiff] learned that the two nurses with whom he was working received correspondence from a grief counselor and a member of [Defendant] leadership, respectively. However, Plaintiff was never contacted by anyone." (*Id.* ¶ 21.)

"Continuing through the present, [Plaintiff] still has not received correspondence from a grief counselor, despite multiple difficult calls having come in between the Fall of 2024 and the present, and similarly situated, non-Native American critical care providers having received grief counselor correspondence without request on those occasions." (*Id.* ¶ 22.)

D. **Training Video**

In or around the summer of 2024, Plaintiff "observed [Defendant's] leadership training video." (*Id.* ¶ 23.) This video "instructs viewers to 'be an Indian.'" (*Id.*) "The speaker is not Native American." (*Id.*) "In the video, the speaker tries to skip out on taxes by moving his company to a Native American Reservation." (*Id.*) Plaintiff "was deeply disturbed by the video and felt that it mocked the opportunities provided to Native Americans to help offset the hardships and shortcomings that take place on Reservations." (*Id.* ¶ 24.)

E. **Comments About Native Americans**

"When [Plaintiff] was at the Show Low Base, he was subjected to inappropriate and discriminatory comments and conduct about Native Americans on a weekly basis, directed towards him." (*Id.* ¶ 25.) "Since moving to work primarily out of the Safford Bases, almost every time [Plaintiff] has done a workover shift, which is on an at least monthly or more basis, he has been subjected to inappropriate and discriminatory comments and conduct about Native Americans, directed towards him." (*Id.*) "At the Safford Base[s], the only reason [Plaintiff] does not continue to be subjected to inappropriate and discriminatory comments and conduct about Native Americans on a weekly basis—and instead only on workover shifts, on a monthly or more basis—is because he intentionally puts himself on shifts with individuals who he believes will not engage in such comments or conduct towards him." (*Id.*) "When he first started at the Safford Base[s], the comments persisted on a weekly basis until [Plaintiff] made this adjustment." (*Id.*) "The adjustment has resulted in often undesirable schedule changes with respect to timing." (*Id.*)

"Specifically, when [Plaintiff] was at the Show Low Base, every time a Native American Reservation made a patient call to [Defendant] on which [Plaintiff] was staffed (which occurred approximately weekly), one or more of [his] . . . co-workers on the flight to the Reservation subjected [Plaintiff] to discriminatory comments and conduct relating to Native Americans." (*Id.* ¶ 27.) "The discriminatory comments and conduct . . . included, but were not limited to: (1) comments and conduct relating to how [Defendant] should not respond to Native American Reservations; (2) comments and conduct relating to how Native Americans do not require air medical transportation; (3) comments and conduct relating to how Native Americans are more difficult to care for; and (4) comments and conduct relating to how Native Americans are violent, including comments and conduct about how Native Americans should not be able to own guns, which would control the number of gunshot calls to Reservations that [Defendant] receives and 'help control them better.'" (*Id.* ¶ 28.) "[T]he individuals making the comments, at all relevant times, knew and know that [Plaintiff's] race and/or national origin and/or ancestry is Native American,

that he is an enrolled member of the White Mountain Apache Tribe, and directed the comments and conduct specifically towards him." (*Id.*) "[S]imilarly situated, non-Native American critical care providers have noticed these comments and conduct and targeted [Plaintiff] with questions about how he 'feels' about them, which heightens the discomfort and humiliation [Plaintiff] already has about them." (*Id.*)

Plaintiff "has never heard inappropriate and discriminatory comments or seen inappropriate and discriminatory conduct towards any other race and/or national origin and/or ancestry than the comments and conduct he hears and sees about Native Americans, directed towards him." (*Id.* ¶ 26.)

F. **Substandard Care**

"[F]or the duration of [Plaintiff's] time at the Show Low Base and on every workover shift during his time at the Safford Bases, and continuing through the present, [Defendant] (other than [Plaintiff]) provided and provides substandard patient care to Native Americans on about one-third of the calls to Native American Reservations." (*Id.* ¶ 31.) "The patient care that [Defendant] (other than [Plaintiff]) provided and provides to Native Americans on these occasions fell well below the appropriate standard of care." (*Id.*) Defendant "provided and provides substandard medical care to Native Americans both because of (1) their race and national origin, but also because (2) most Native Americans are either Arizona Health Care Cost Containment System ('AHCCCS') or Medicare/Medicaid patients, for whom the cost of recoupment to [Defendant] is lower." (*Id.*) "Similarly situated, non-Native American critical care providers have noticed these trends and targeted [Plaintiff] with questions about how he 'feels' about it, which heightens the discomfort and humiliation [Plaintiff] already has about it." (*Id.*)

G. **Plaintiff's Reports**

"From his hire in December 2021 through in or around April 2023, [Plaintiff] consistently reported [Defendant's] inappropriate and discriminatory comments and conduct through [Defendant's] chain of command and/or Human Resources, with no corrective action taken." (*Id.* ¶ 32.) "During this time, [Plaintiff] also reported the

substandard patient care that [Defendant] provided to Native Americans to [Defendant] leadership, with no corrective action taken." (*Id.*)

In or around April 2023, Defendant "conducted a sham Human Resources investigation into [Plaintiff's] concerns and ultimately ignored them." (*Id.* ¶ 33.) "Thus, [Defendant] put [Plaintiff] into a catch-22, forcing him to remain silent with respect to Human Resources in the face of [Defendant's] continuing discriminatory conduct." (*Id.*) As discussed above, Defendant's "discriminatory conduct . . . continued after the April 2023 sham investigation on a weekly basis at the Show Low Base and on an at least monthly, often more frequent, basis at the Safford Bases." (*Id.*)

"Because the conduct continued and [Plaintiff] was silenced by Human Resources, he was forced to periodically report his concerns and complaints about the inappropriate and discriminatory comments to which he was directly subjected on a monthly, if not more, basis at the Safford Base[s], informally to his supervisors." (*Id.* ¶ 34.) Plaintiff's "supervisors never took—and still have not taken—any action with respect to [his] complaints, which persisted from April 2023 through the Fall of 2024, and continue today." (*Id.*) Instead, and as discussed in greater detail below, Plaintiff's "supervisors have nit-picked him with 'debrief' meetings, looking to find something he did wrong, distanced themselves from him, and often refused to speak to him." (*Id.*)

H. **Supervisors' Comments**

In or around September 2024, Plaintiff "heard his [Defendant] supervisors discussing [Defendant's] efforts to intentionally and strategically minimize or abstain from service or patient call response to the White Mountain Apache Reservation, calling service to the White Mountain Apache Reservation a 'misuse of resources.'" (*Id.* ¶ 35.) Plaintiff "did not report the supervisors' comments because the supervisors are the same individuals he is supposed to report to and, as noted above, Human Resources had wholly ignored every single one of his complaints." (*Id.*)

I. **Pay Raise And Retention Bonus**

"During the Fall of 2024, [Defendant's] discrimination towards [Plaintiff] also

escalated . . . ." (*Id.* ¶ 36.) Specifically, on November 14, 2024, Defendant "contacted its Paramedics to announce a pay raise." (*Id.*) "Paramedics would receive a pay raise between 2.5% and 10% based on performance." (*Id.*) "The four criteria for the pay raise were: Performance Review, Corrective Actions, Clinical Incidents, and Clinical Accidents." (*Id.*) "In the same email, [Defendant] offered an immediate $10,000 retention bonus to eligible Paramedics willing to stay with [Defendant] for at least two more years." (*Id.*)

Plaintiff's "pay raise was capped at 5%," and Defendant "did not offer [Plaintiff] any clarity on why his pay raise was capped at 5%." (*Id.* ¶ 37.) Plaintiff "did not receive the full performance-based pay raise." (*Id.* ¶ 38.) "[T]he performance-based criteria that [Defendant] used to justify the 5% raise towards [Plaintiff] were based on a 'rigged' system of capping [his] performance metrics and inaccurate commentary about [his] performance." (*Id.*) "[S]imilarly-situated, non-Native American Flight Paramedics received the full performance-based bonus." (*Id.*)

On December 2, 2024, Plaintiff "denied the retention bonus." (*Id.* ¶ 39.) Defendant's "Human Resources Generalist, Amy Jamieson ('Jamieson'), responded to [Plaintiff's] denial to ask why [he] had denied the retention bonus." (*Id.*)

On December 12, 2024, Plaintiff "responded to Jamieson's email" and "explained his extraordinary performance and his satisfaction of each of the four criteria for the full 10% pay raise," and he "further explained that he felt [Defendant's] denial of the full 10% pay raise to him was because he had consistently and verbally made complaints about [Defendant's] policy and practice of a lack of cultural empathy and inclusivity toward Native American traditions and communities." (*Id.* ¶ 40.) Plaintiff "provided several examples of [Defendant's] discriminatory comments, conduct, and treatment relating to Native Americans in his December 12, 2024 email, and he expressed his hope that the feedback would finally inspire meaningful action." (*Id.* ¶ 41.)

On December 13, 2024, "Jamieson responded and 'noted' [Plaintiff's] concerns but . . . Human Resources did nothing to investigate [his] concerns." (*Id.* ¶ 42.) Defendant "never responded to [Plaintiff] to explain why he fell short for the pay raise, nor did it ever

contact [him] to request more information about his concerns." (*Id.*)

J. **Post-EEOC Charge Developments**

On December 31, 2024, Plaintiff filed his first EEOC Charge of Discrimination. (*Id.* ¶ 43.)[1]

1. Continued Comments About Native Americans

"Since filing his first EEOC Charge of Discrimination, the remarks described above . . . have persisted, in [Plaintiff's] presence, on an at least monthly, and often more frequent, basis." (*Id.* ¶ 44.) As discussed, the only reason they have not continued on a weekly basis is because Plaintiff took it upon himself to (unfavorably) alter his work schedule to avoid the comments. (*Id.*)

2. "Burn The Town" Comment

On February 26, 2025, "the remarks escalated." (*Id.* ¶ 45.) That day, Plaintiff "was subjected to highly inappropriate and offensive remarks by [Defendant] Flight Nurse Brittany Sokalick (phonetic) ('Brittany')." (*Id.*) "Specifically, Brittany stated in [Plaintiff's] presence, and directed to [Plaintiff], that she wished another fire would start and 'burn the town' so she would no longer have to respond to medical calls from Native American reservations." (*Id.*) "Brittany's comment trivialized the immense devastation caused by the July 2024 Watch Fire, which destroyed homes and displaced many Native American families, including [Plaintiff's]." (*Id.*) "The comment, like all the others

[1] Defendant attaches a copy of Plaintiff's December 31, 2024 EEOC Charge to its motion. (Doc. 16 at 22-29.) "Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For materials incorporated by reference, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448. Plaintiff's EEOC Charge may be considered because it is incorporated by reference into the FAC. *Hoyt v. Ariz. Bd. of Regents*, 2026 WL 160870, *3 (D. Ariz. 2026). The FAC refers to the EEOC Charge (Doc. 8 ¶¶ 5, 43); the Charge is central to the timeliness of certain of Plaintiff's claims; and no party questions the authenticity of the EEOC Charge attached to Defendant's motion.

[Plaintiff] has heard and/or been directly subjected to by [Defendant] employees, devastated, humiliated, abused, and ridiculed both him and his culture." (*Id.*) "Western Region Clinical Manager Shanna Butler ('Butler') also heard Brittany's comments," but "Butler took no corrective action and wholly failed to address Brittany's remarks." (*Id.*) "Both Brittany and Butler, as well as all other individuals present, . . . knew, at all relevant times, that [Plaintiff's] race and/or national origin and/or ancestry is Native American and that he is an enrolled member of the White Mountain Apache Tribe." (*Id.*)

On March 26, 2025, Plaintiff "reported Brittany's comments to Human Resources, as well as Butler's ignorance towards the same." (*Id.* ¶ 46.) "Bryan King ('King') with [Defendant's] Human Resources Department responded the same day simply acknowledging receipt of [Plaintiff's] report." (*Id.*) Plaintiff "did not hear anything else until April 23, 2025, when King followed up with him regarding an 'investigation.'" (*Id.* ¶ 47.) "This [was] the first time in [Plaintiff's] employment with [Defendant] that he received any substantive follow-up regarding his complaints about discrimination towards Native Americans and . . . [was] the first time [Defendant's] Human Resources ha[d] 'investigated' [his] complaints." (*Id.*) "This substantive follow-up . . . was only done after [Plaintiff] had filed his first EEOC Charge." (*Id.*)

On April 25, 2025, "a different Human Resources employee, Brent Norden ('Norden'), emailed [Plaintiff] to interview him regarding his EEOC Charge." (*Id.* ¶ 48.) Plaintiff "declined to meet with Norden regarding his ongoing legal proceedings, but on May 5, 2025, he met with King regarding his complaint about Brittany's comments." (*Id.* ¶ 49.) "Throughout the meeting, King repeatedly urged [Plaintiff] to 'admit' that Brittany's comments were jokes," but Plaintiff "refused to state that any comment amounting to genocide of the Apache people was a 'joke,' until King dropped the matter." (*Id.*)

Plaintiff "did not hear from King again about the 'investigation' until June 19, 2025, when King informed him that the investigation was closed and 'appropriately addressed.'" (*Id.* ¶ 50.) "Brittany was never disciplined." (*Id.*)

…

3. Rehiring Of Complained-About Individual

In the spring of 2025, Defendant "re-hired an individual, Abrianna Pacheco ('Pacheco'), who [Plaintiff] had previously reported for discriminatory statements about Native Americans." (*Id.* ¶ 51.)

4. Overtime

On June 13, 2025, Plaintiff "emailed shift supervisor Jerry Campos ('Campos'), Brittany's base supervisor and Pacheco's ex-boyfriend, to ask for extra shifts, akin to overtime opportunities, on July 3, 2025 and July 9, 2025." (*Id.* ¶ 52.) "Traditionally at [Defendant], extra shifts are given out based on a first-come, first-serve basis." (*Id.*) "Campos told [Plaintiff] that the shifts had already been picked up." (*Id.* ¶ 53.) "The person who got the shifts instead of [Plaintiff] is a similarly-situated, non-Native American employee." (*Id.*)

"[Plaintiff] asked how much earlier the other individual had requested the shifts," and he "pursued the issue because he felt, based on his prior experience(s) with the assignment of extra shifts, that he was being retaliated against based on his protected complaints of discrimination and hostile work environment based on his Native American race, national origin, and ancestry." (*Id.* ¶ 54.) "Campos responded that the shifts had already been considered for the other individual based, in large part, on 'operational considerations—such as overall cost to the base, including mileage, drive time, and potential lodging needs.'" (*Id.* ¶ 55.) "Campos conceded the policy was 'informal.'" (*Id.*) "However, in almost 4 years of employment with [Defendant], [Plaintiff] had never heard of such a policy being applied to anyone, and still has not seen or heard it applied to anyone but him." (*Id.*)

On August 5, 2025, Plaintiff "requested an extra shift at the Wickenburg Base, which is four hours away, and he was approved by that Base's supervisor, who is new to [Defendant] and separate from Campos." (*Id.* ¶ 56.)

"Since the overtime opportunity denial incident with Campos, and continuing through the present, [Plaintiff] has again limited his interaction with certain individuals and

his attempts to seek overtime opportunities for fear of further retaliation, despite overtime opportunities never having been an issue for [Plaintiff] before he pursued his claims." (*Id.* ¶ 57.) "Additionally, since the overtime opportunity denial incident with Campos, and continuing through the present, just as he does with his Safford Base[s] shifts, [Plaintiff] checks the schedule for mandatory trainings and chooses which trainings to attend so as to avoid individuals who might retaliate against him or make inappropriate and discriminatory comments about Native Americans directed towards him." (*Id.* ¶ 58.)

5. Supervisor Scrutiny And Upper Management's Mocking Email

"Since April 2025 when Human Resources contacted him regarding his EEOC Charges, and continuing through the present, [Plaintiff's] supervisors have overly scrutinized, nit-picked, and double checked his work in a way that they have never done to him before, and in a way that they have never done and do not do to similarly situated critical care providers." (*Id.* ¶ 59.) "For example, despite the fact that multiple critical care providers are staffed on calls, [Plaintiff's] supervisors have periodically, since April 2025, requested that he—and he only—'debrief' patient care choices with them." (*Id.*) "The 'debriefing' includes the supervisors pouring [sic] over [Plaintiff's] patient care choices and claiming there are issues, requiring [Plaintiff] to refer them to paperwork to verify he did not make mistakes." (*Id.*)

"Since April 2025 when Human Resources contacted him regarding his EEOC Charges, and continuing through the present, [Plaintiff's] supervisors have distanced themselves from him, often refusing to speak to him." (*Id.* ¶ 60.)

"By way of additional example, [Plaintiff] filled out a form that was sent to all similarly situated critical care providers with a suggestion for improving patient care in surrounding areas—a topic he has raised in his EEOC Charges and this lawsuit." (*Id.* ¶ 61.) "In response, [Defendant's] upper management sent a company-wide email responding to and mocking [Plaintiff's] suggestion." (*Id.*) Defendant's "upper management had never directly approached or acknowledged [Plaintiff] prior to him pursuing his claims." (*Id.*)

"The combination of the[se] circumstances . . . has placed [Plaintiff] in a spotlight

of scrutiny, discomfort, humiliation, and fear, that no similarly situated, non-Native American employees are forced to experience." (*Id.* ¶ 62.)

II. <u>Procedural History</u>

Plaintiff "fil[ed] two . . . Charges of Discrimination with the [EEOC] on December 31, 2024 and July 30, 2025, respectively." (*Id.* ¶ 5. *See also* Doc. 16 at 22-29 [December 31, 2024 EEOC Charge].) "The EEOC issued [Plaintiff] Notices of Right to Sue on both his Charges on July 16, 2025 and August 6, 2025, respectively." (Doc. 8 ¶ 6. *See also* Docs. 8-1, 8-2.)

On September 19, 2025, Plaintiff initiated this action. (Doc. 1.)

On December 5, 2025, Plaintiff filed the FAC. (Doc. 8.)

On February 20, 2026, Defendant moved to dismiss the FAC. (Doc. 16.) The motion is now fully briefed. (Docs. 17, 20.)[2]

## LEGAL STANDARD

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

---

[2] The parties' requests for oral argument are denied because the issues are fully briefed and argument would not aid the decisional process. *See* LRCiv 7.2(f).

## DISCUSSION

I. Timeliness Of Title VII Claims (Counts One, Two, And Three)

### A. The Parties' Arguments

Defendant argues that "Title VII bars claims based on discrete discriminatory acts that occur more than 300 days before an EEOC Charge is filed" and that "Plaintiff filed his first EEOC charge on December 31, 2024," so "any discrete acts that occurred before March 6, 2024, are time-barred and cannot be considered as part of his Title VII claims." (Doc. 16 at 6-7, emphasis omitted.) Defendant argues that "this includes the entire period during which Plaintiff was stationed at the Show Low Base" and that "[a] majority of Plaintiff's factual allegations purportedly occurred while he was stationed at the Show Low Base," including "that he was asked to cut his hair," that Defendant "did not grant requests for counseling," that Plaintiff "heard allegedly discriminatory comments on a weekly basis," and that Plaintiff made "complaints to Human Resources up through April 2023" that were "not properly addressed." (*Id.* at 7.)

In response, Plaintiff argues that Count Two (Title VII hostile work environment) "affirmatively pleads—and the factual allegations in [the FAC] support—application of the continuing violations doctrine," which "permits a court to consider events that would otherwise be time-barred if the untimely incidents are part of an on-going unlawful employment practice." (Doc. 17 at 7, citation omitted.) Plaintiff argues that he "has pleaded, in detail, the Comments and overt behavior that have persisted since the beginning of his employment in December 2021 which, together with the retaliation he faced and continues to face, constitute a timely-pleaded 'single course of conduct' as to his Title VII hostile work environment claim" and that "[c]ourts within the Ninth Circuit have repeatedly found such allegations sufficient to apply the continuing violations doctrine *and* state a claim for Title VII hostile work environment at the pleadings stage." (*Id.* at 8.) As for his Title VII discrimination and retaliation claims, Plaintiff clarifies that "he pleads only events after March 6, 2024 (300 days before he filed his EEOC Charge on December 31, 2024)." (*Id.* at 8-9.) "With respect to [his] periodic complaints to HR and his supervisors,"

Plaintiff argues that the allegations in the FAC "make clear that those complaints persisted through 2024 and 2025 and continue today." (*Id.* at 9.) Plaintiff also argues that his "supervisors made overt discriminatory comments about patient care calls to Native Americans in late 2024, during this period." (*Id.*) Next, Plaintiff argues that the FAC "supports the inference that [his] supervisors' overt discriminatory comments causally connect (1) [his] repeated complaints about the specific comments targeted towards him and Defendant's general substandard care on Reservations, (2) his supervisors' failure to act, and (3) his supervisors' subsequent retaliation towards [him]." (*Id.*) Plaintiff also argues that his "supervisors targeted him with 'debriefing,' ostracizing, and mocking, all between late 2024 and the present." (*Id.*) Plaintiff further argues that Defendant "denied [him] the full (allegedly) performance-based raise for pretextual reasons in late 2024," "denied [him] overtime shifts for 'shifting' pretextual reasons," and "fail[ed] to provide him a grief counselor . . . from Fall 2024 through the present." (*Id.*) Plaintiff contends that "[n]ot only are these events timely, but they are also sufficiently severe to constitute adverse employment actions for both claims." (*Id.*)

In reply, Defendant reiterates that "[i]t is well-settled that Title VII bars claims based on discrete discriminatory acts that occur more than 300 days before an EEOC Charge is filed." (Doc. 20 at 2.) Defendant argues that "Plaintiff concedes that the continuing violations doctrine is not applicable to claims of discrimination or retaliation." (*Id.*, cleaned up.) Defendant argues that "Plaintiff's EEOC Charge clearly states that Plaintiff worked primarily at [Defendant's] Show Low Base until at least February 2024," and "[b]ecause Plaintiff filed his first EEOC Charge on December 31, 2024, any discrete acts that occurred before March 6, 2024 are time-barred." (*Id.* at 2-3, emphasis omitted.) Defendant argues that "[t]hese time-barred allegations plainly encompass Plaintiff's contention that he was asked to cut his hair shortly after being hired," "allegations that he allegedly heard discriminatory comments (from unnamed and unspecified coworkers) while stationed at the Show Low Base," and "that he requested (at unspecified times and for unspecified flights) requests for counseling." (*Id.* at 3.) Defendant also argues that

"Plaintiff's additional allegations that he reported concerns to Human Resources beginning in April 2023, and then 'periodically report[ed] his concerns' thereafter, are similarly discrete acts that predate the statute of limitations period and are not actionable under Title VII because they are untimely." (*Id.*)

B. **Analysis**

"Before a plaintiff may file a Title VII . . . suit in federal court, [he] must first file a charge with the EEOC. Additionally, [the plaintiff's] charge must be filed with the EEOC 'within 300 days after the alleged unlawful practice occurred.'" *Bond v. Wells Fargo Bank NA*, 782 F. Supp. 3d 743, 752-53 (D. Ariz. 2025) (citation omitted).[3]

As a preliminary matter, Plaintiff's briefing clarifies that his "Title VII discrimination and retaliation claims (Counts I and III) . . . plead[] only events after March 6, 2024 (300 days before he filed his EEOC Charge on December 31, 2024)." (Doc. 17 at 8-9.) In light of this clarification, any facts pertaining to earlier events are being proffered, at least in relation to Counts One and Three, as background only. "So long as those allegations can be construed as 'background evidence,' and that construction is favorable to Plaintiff, their presence may assist Plaintiff in staving off a Rule 12(b)(6)-based dismissal attempt. . . . [A]ny potential for mischief posed by the presence of those allegations is mitigated by Plaintiff's concession in [his] response brief that [Counts One and Three] [are] only intended to state a claim for discrimination [and retaliation] based on" events occurring within 300 days of the charge. *Bond*, 782 F. Supp. 3d at 755. Thus, to the extent Defendant is seeking to dismiss these allegations, that request is denied, but the Court "will proceed with the understanding that they do not purport to set forth claims" for discrimination and/or retaliation. *Id.* (citation omitted).

As for Count Two (Title VII hostile work environment), "[i]t does not matter . . .

[3] "Because Arizona has its own state agency empowered to investigate and remedy allegations of discrimination in employment, Arizona is a so-called deferral state. In deferral states, the deadline for a complainant to file a claim with the EEOC is extended from the ordinary 180 days to 300 days if the complainant first initiates proceedings with the state agency. Additionally, where, like here, the ACRD and EEOC are parties to a worksharing agreement, a complainant need not file separately with federal and state agencies." *Bond*, 782 F. Supp. 3d at 753 n.3 (cleaned up).

that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). *See also Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) ("*Morgan* does not call for the most egregious of the harassing events to occur within the [statutory] period, nor does it demand that the harassing conduct continue to escalate over time in order for a hostile-environment claim to be actionable."); *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003) ("In contrast to discrete acts, . . . claims based on a hostile environment will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.") (cleaned up). Because at least some discriminatory acts alleged in the FAC occurred within the 300-day period, Defendant's dismissal argument based on untimeliness lacks merit as to Count Two.

## II. Title VII Discrimination (Count One)

### A. **The Parties' Arguments**

Defendant argues that "Plaintiff's Title VII discrimination claim should be dismissed because he does not plausibly allege that similarly situated individuals outside his protected class were treated more favorably." (Doc. 16 at 8.) Defendant argues that "Plaintiff provides no more than threadbare, conclusory allegations to support his claims." (*Id.*) Specifically, Defendant argues that "Plaintiff does not identify a single similarly situated non-Native American who received a higher pay raise than he did" and does not "allege that non-Native Americans who had similar performance metrics received a higher pay raise." (*Id.*) Instead, Defendant argues that "Plaintiff summarily alleges unnamed coworkers, who worked at unnamed bases, on unnamed dates, were 'upon information and belief, similarly situated, non-Native American Flight Paramedics [who] received the full performance-based bonus.'" (*Id.*, quoting Doc. 8 ¶ 38.) Defendant argues that "[t]o survive a Rule 12(b)(6) motion, Plaintiff must do more than make conclusory allegations

that employees outside of the relevant protected class were treated more favorably." (*Id.*) Similarly, Defendant argues that the FAC "fails to provide sufficient detail" regarding the allegation "that in fall 2024, a grief counselor did not contact [Plaintiff] although 'two nurses' he worked with received outreach from the counselor." (*Id.* at 9.) "Aside from having different job duties," Defendant argues that "Plaintiff does not identify whether the unnamed two nurses worked on similar patients, cases, or shifts as Plaintiff." (*Id.*) As for "Plaintiff's claim that he was denied overtime shifts," Defendant argues that "Plaintiff again makes a conclusory allegations regarding 'the person who got the shifts instead of [him]'" but "does not identify whether the 'operational considerations' Plaintiff was told were factors that were considered were similar for his unnamed coworker as they were for himself." (*Id.*) Next, Defendant argues that "[b]esides failing to sufficiently allege that similarly situated non-Native American coworkers were treated more favorably, Count One should be dismissed because Plaintiff does not allege facts that, accepted as true, create a plausible inference of discrimination." (*Id.*) Specifically, Defendant argues that "Count One must be limited to discrete acts that took place after March 6, 2024," but "[n]one of the purported adverse actions alleged by Plaintiff plausibly support a claim for discrimination based on national origin or race discrimination." (*Id.*) For example, Defendant argues that "Plaintiff alleges that he received a 5% raise based on performance but does not allege that any decisionmaker held or made any comment suggesting discriminatory animus." (*Id.*) Defendant also argues that "Plaintiff does not suggest any reason why his 5% raise was discriminatory other than his conclusory assertion that the stated performance-based criteria were based on a 'rigged' system of capping only Plaintiff's performance record." (*Id.*) As for Plaintiff's claim that "he was unfairly denied two overtime shifts," Defendant argues that claim is "belied by his own pleading in which he admits that another coworker requested the shifts before he did." (*Id.* at 10.)

In response, Plaintiff argues that Defendant "misrepresents the facts and law." (Doc. 17 at 14.) Plaintiff argues that he "has plausibly alleged similarly situated, non-Native American individuals were treated more fairly," and "[e]ven if he has not, as

Defendant's own case law states, in the absence of a similarly situated comparator, a plaintiff can also allege other circumstances that give rise to an inference of discrimination, which [Plaintiff] has done." (*Id.*, cleaned up.) "With respect to Defendant's pretextual denial of the full (allegedly) performance-based pay raise," Plaintiff argues that he "has met his burden at the pleadings stage" because he pleads (1) "the performance-based criteria he and his fellow Flight Paramedics needed to meet to receive the full pay raise"; (2) "the date he and all Flight Paramedics received notice of what level raise they would receive"; and (3) "that he met the enumerated criteria, but that he did not receive the full pay raise—or even an explanation of why he did not," even though "similarly situated, non-Native American Flight Paramedics, did." (*Id.* at 15.) Plaintiff argues that the FAC "supports the reasonable inference that these Flight Paramedics also met the enumerated criteria" and that "[t]he only differences between them and [Plaintiff] are that they are not one of the three Native Americans working in Arizona, and they had not complained to Defendant about the hostile, discriminatory, and retaliatory environment Defendant perpetuates against Native Americans." (*Id.)* As for "Defendant's denials of grief counselors," Plaintiff argues that he "specifically pleads that non-Native American critical care workers *on the same flights* that he was on were offered grief counselors for incidents on those flights, but he was not." (*Id.*) As for "Defendant's denial of overtime shifts," Plaintiff argues that he "again adequately pleads that the individual who received the shifts was a non-Native American Flight Paramedic" and that the FAC "supports the reasonable inference—by way of [Plaintiff] getting a shift four hours away from another supervisor—that 'operational considerations' were a sham, so they could not have been applied equally between two individuals." (*Id.* at 15-16.) Plaintiff also argues that the FAC's "allegations are sufficient because he is not required to identify a specific individual to state a claim" and "is only required to plead that his comparators 'have similar jobs and display similar conduct.'" (*Id.* at 16, citation omitted.) And Plaintiff argues that he "is further not required to affirmatively allege his comparators' races" because "[s]imply stating they are 'non-Native American' is sufficient." (*Id.*) Alternatively, Plaintiff argues that "he has plausibly

alleged 'other circumstances that give rise to an inference of discrimination.'" (*Id.*, citation omitted.) Specifically, Plaintiff argues that the FAC "supports the inference that his supervisors' overt discriminatory comments about Reservations causally connect (1) [Plaintiff's] repeated complaints about the Comments and Defendant's substandard care on Reservations, (2) his supervisors' failure to act, and (3) his supervisors' subsequent retaliation towards [him] with targeted, specifically pleaded adverse actions." (*Id.* at 17.)

In reply, Defendant argues that "Plaintiff's Response does little to highlight factual allegations that plausibly suggest an inference of discrimination." (Doc. 20 at 3.) For example, Defendant argues that Plaintiff's response "relies heavily on purported 'specific comments targeted towards him,'" "[b]ut a close reading of the [FAC] reveals no such specificity." (*Id.*) Instead, Defendant argues that "Plaintiff alleges generally that comments were made about (1) not responding to Native American Reservations; (2) Native Americans not requiring air medical transportation; (3) Native Americans requiring more difficult care; and (4) Native Americans should own fewer guns so there are fewer gunshot calls." (*Id.*) Defendant argues that "[t]hese extremely generalized, derivative comments are not sufficient to support a claim under Title VII" because "[t]here is nothing about these statements that qualifies as facially offensive," "Plaintiff does not . . . contend that he was subjected to racial epithets or racially threatening language," and "nowhere does [Plaintiff] allege that he was the subject or target of any allegedly discriminatory comment." (*Id.*) Additionally, Defendant reiterates that "Plaintiff fails to identify any similarly situated non-Native Americans who were treated differently or more favorably than he was." (*Id.* at 4.) "Regarding his pay raise," Defendant argues that "Plaintiff does not allege that non-Native Americans who had similar performance histories received higher pay raises," and "[i]nstead, Plaintiff merely offers his non-factual conjecture that the system was rigged against Plaintiff" and makes "the threadbare allegation that 'upon information and belief, similarly situated, non-Native American Flight Paramedics . . . received the full performance-based bonus.'" (*Id.*, quoting Doc. 8 ¶ 38.) Next, Defendant argues that "Plaintiff also claims in his Response that [Defendant's] purported denials of

grief counselors and overtime shifts somehow meet his burden to plausibly state a cause of action," but "Plaintiff's Response exaggerates the factual allegations set forth in the [FAC]." (*Id.* at 4-5.) For example, Defendant argues that Plaintiff's response claims that "critical care workers *on the same flights*" were given grief counselors when Plaintiff was not, "[b]ut this allegation is nowhere to be found in the [FAC]." (*Id.* at 5.) Defendant emphasizes that that FAC "does not contend that [Plaintiff] was on the same flight as these nurses," and "even if they were on the same flight together, Plaintiff has not proffered adequate factual allegations to establish that a nurse and someone in Plaintiff's role, a Flight Paramedic, occupy similarly situated job titles." (*Id.*) Last, Defendant argues that "Plaintiff's argument that he was allegedly denied extra overtime shifts is equally unavailing" because "Plaintiff alleges that multiple supervisors provided separate and facially legitimate reasons for denying his shift requests" and "Plaintiff does not raise any allegations that plausibly can be interpreted as discriminatory." (*Id.*) And Defendant argues that any "alleged connection between his shift supervisor being the *ex-boyfriend* of someone who allegedly made discriminatory statements" is a "lone, attenuated connection [that] is insufficient to plausibly allege discrimination based on national origin." (*Id.*)

B. **Analysis**

A prima facie claim under Title VII for discrimination has four elements: "(1) [the plaintiff] is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).[4]

---

[4] *Peterson* was decided under the *McDonnell Douglas* burden-shifting framework applicable to Title VII discrimination claims at the summary judgment stage. 358 F.3d at 603. As this Court has previously recognized, the analysis of Title VII discrimination claims at the pleading stage is "governed by Rule 8, not the *McDonnell Douglas* framework." *Chandler v. DeJoy*, 2021 WL 673289, *13 (D. Ariz. 2021). Nevertheless, "although plaintiffs do not have the burden of establishing a *prima facie* case at the pleading stage, courts in the Ninth Circuit continue to review discrimination complaints under the *McDonnell Douglas* framework so as to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* (cleaned up).

Defendant does not dispute the first two elements. (Doc. 16 at 8-10.) As for the third element, Plaintiff's response brief appears to identify the relevant alleged adverse employment actions as (1) the failure to give Plaintiff the full 10% pay raise, (2) the failure to provide Plaintiff with a grief counselor, and (3) the denial of Plaintiff's request for an overtime shift. (Doc. 17 at 15-16.) Defendant, in turn, does not dispute that any of those developments qualify as adverse actions—instead, Defendant disputes whether Plaintiff can satisfy the fourth element of the prima facie test with respect to any of them. (Doc. 16 at 8 ["Plaintiff's Title VII discrimination claim should be dismissed because he does not plausibly allege that similarly situated individuals outside his protected class were treated more favorably."].)

The Court will begin by addressing the pay raise because it is dispositive. On the one hand, Plaintiff has failed to adequately allege that similarly situated non-Native Americans were treated more favorably and given the full 10% raise. The FAC simply alleges, in conclusory fashion, that "[u]pon information and belief, similarly-situated, non-Native American Flight Paramedics received the full performance-based bonus." (Doc. 8 ¶ 38.) This type of conclusory allegation is insufficient. *See, e.g.*, *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019) ("[I]t is insufficient for a plaintiff to allege, for instance, that she did not receive an employment benefit that 'similarly situated' employees received. A plaintiff's assertion that she is 'similarly situated' to other employees is just a legal conclusion—and a legal conclusion is never enough.") (cleaned up); *Barrett v. Kaiser Found. Health Plan of Nw.*, 2015 WL 1491037, *3 (D. Or. 2015) (allegation "that Defendant treated one similarly situated non-African American employee, Mark Bennet, more favorably than Plaintiff 'under similar, or more egregious, circumstances' . . . provides no more than a conclusory assertion that Plaintiff and Mr. Bennett were similarly situated"); *Chandler*, 2021 WL 673289 at *15 ("[A]s for prong four, Plaintiff fails to allege any facts to support his conclusory assertion that Holsome-Benion, who seems to have held

---

*See also Albro v. Spencer*, 854 F. App'x 169, 169-70 (9th Cir. 2021) (applying *McDonnell Douglas* when evaluating Rule 12(b)(6) motion).

a supervisory role over Plaintiff, was in fact similarly situated to him.") (citations omitted). Indeed, the FAC says nothing about whether the flight paramedics who received the full 10% raise had similar or the same performance metrics as Plaintiff, were stationed at the same base(s) as Plaintiff, performed similar work as Plaintiff, etc.

On the other hand, "identification of a similarly situated comparator is only one way to establish discrimination. The fourth element can also be established via 'other circumstances surrounding the adverse employment action give rise to an inference of discrimination.'" *Ruggles v. State*, 2025 WL 1745023, *8 (D. Ariz. 2025) (quoting *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)). *See also Ruiz v. Magellan Fin. & Ins. Servs.*, 2025 WL 1796275, *9-13 (D. Ariz. 2025) (denying defendant's motion for summary judgment on Title VII discrimination claim, even though the plaintiff likely failed to identify "a permissible comparator for purposes of the fourth step of *McDonnell Douglas*," because the plaintiff came forward with evidence that supervisors had made overtly discriminatory comments close in time to the challenged employment action). Plaintiff alternatively argues that even if he has not shown that similarly situated individuals were treated more favorably, there are "other circumstances that give rise to an inference of discrimination." (Doc. 17 at 16, citation omitted.) The Court agrees that the FAC sufficiently alleges "other circumstances" surrounding the November 2024 denial of the full 10% pay raise that may plausibly give rise to an inference of discrimination.[5] For example, the FAC alleges that "[i]n or around September 2024, [Plaintiff] heard his [Defendant] supervisors discussing [Defendant's] efforts to intentionally and strategically minimize or abstain from service or patient call response to the White Mountain Apache Reservation, calling service to the White Mountain Apache Reservation a 'misuse of resources.'" (Doc. 8 ¶ 35.) Drawing all reasonable inferences in favor of Plaintiff, this comment, made by Plaintiff's supervisors just two months before the denial of the full 10% raise, suggests that those supervisors viewed Native Americans as inferior and undeserving

[5] This conclusion renders it unnecessary to determine whether the FAC sufficiently states a claim for Title VII discrimination based on the other two alleged adverse employment actions (i.e., denial of overtime and grief counselors).

of medical care. The Ninth Circuit has repeatedly held that a plaintiff may establish liability in a Title VII discrimination case by showing that a supervisor made remarks of this sort. *See, e.g., Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1039 (9th Cir. 2005) ("[I]n this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."); *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) ("Evidence of ethnically biased remarks from a person in such a position of authority are sufficient to allege the connection necessary . . . to survive summary judgment."); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148-49 (9th Cir. 1997) (noting that a plaintiff can "establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test, if she provides evidence suggesting that the employment decision was based on a discriminatory criterion illegal under the Civil Rights Act" and denying defendant's motion for summary judgment where the plaintiff "offered direct evidence of such discriminatory animus: [a supervisor's] alleged comments that Maldonado was a 'dumb Mexican' and that he was hired because he was a minority"); *Nguyen v. Qualcomm, Inc.*, 501 F. App'x 691, 694 (9th Cir. 2012) ("Stanton was Nguyen's direct supervisor. Stanton's comments to Nguyen create a genuine issue of material fact on whether Nguyen's gender and Vietnamese national origin were 'motivating factor[s]' in her termination. This genuine issue of material fact defeats summary judgment; the *McDonnell Douglass* framework is inapplicable here because Nguyen presented direct evidence of discrimination.") (citation omitted).[6]

Although the analysis could end there, the FAC also alleges that Plaintiff "satisf[ied]

[6] Although the FAC does not explicitly allege that the supervisors who made the discriminatory comments in September 2024 are the same individuals who denied Plaintiff the full 10% raise, it is reasonable to infer based on "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, that an employee's supervisors would be involved, at least in some capacity, in an employee's performance review. And the rule in the Ninth Circuit is that where "the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision." *Dominguez-Curry*, 424 F.3d at 1039-40. *See also Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005) ("An agent's biased remarks against an employee because of his or her gender are admissible to show an employer's discriminatory animus if the agent was involved in the employment decision.").

. . . each of the four criteria for the full 10% pay raise," but Defendant used a "'rigged' system of capping [Plaintiff's] performance metrics" and relied on "inaccurate commentary about [Plaintiff's] performance" to limit his pay raise to only 5%. (Doc. 8 ¶¶ 38, 40.) The FAC further alleges that Plaintiff continued to "periodically report his concerns and complaints about the inappropriate and discriminatory comments to which he was directly subjected . . . informally to his supervisors . . . through the Fall of 2024," but "[h]is supervisors never took—and still have not taken—any action with respect to [his] complaints." (*Id.* ¶ 34.) At the pleading stage, these factual allegations, particularly when taken together with Plaintiff's supervisors' alleged discriminatory comments, also qualify as "other circumstances" that may plausibly give rise to an inference of discrimination. *Cf. Victory v. Amazon.com, Inc.*, 2026 WL 2445428, *3-4 (D. Conn. 2026) ("An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; *or its invidious comments about others in the employee's protected group*; or the more favorable treatment of employees not in the protected group; *or the sequence of events leading to the plaintiff's discharge*.") (cleaned up, emphases added).

Accordingly, Count One states a claim for discrimination under Title VII.[7]

III. Title VII And § 1981 Hostile Work Environment (Counts Two And Five)

A. **The Parties' Arguments**

Defendant argues that "Plaintiff has not alleged conduct that is sufficiently severe or pervasive enough to sustain a claim for hostile work environment." (Doc. 16 at 15.) "Regarding verbal comments," Defendant argues that "the [FAC] highlights four vague and nonspecific types of statements [Plaintiff] heard while working at the Show Low Base," which "include (1) comments relating to how [Defendant] should not respond to calls at Native American Reservations; (2) comments relating to how Native Americans do

[7] The Court further notes that, in light of its conclusion in Part IV *infra* that Plaintiff has sufficiently stated a claim in Count Four for § 1981 discrimination, it would seem to follow that Plaintiff has also sufficiently stated a claim in Count One for Title VII discrimination, as the only relevant difference between the two claims is that a § 1981 discrimination claim has a more onerous causation standard.

not need air medical transportation; (3) comments relating to how Native Americans are difficult to care for; and (4) comments about how the number of gunshot calls to Native American locations would be reduced if Native Americans were not allowed to own guns." (*Id.*) Defendant argues that "Plaintiff cites one other allegedly offensive comment, made on February 26, 2025, in which a coworker stated that she wished an additional fire would burn a town so she would no longer have to respond to calls." (*Id.*) Defendant argues that "[s]uch comments are neither sufficiently severe nor objectively hostile" because "[n]one of the alleged comments contain offensive epithets or slurs regarding Native Americans" and Plaintiff does not "generally allege who made these comments, when they were made, or where they were made." (*Id.*) Defendant argues that "[i]nstead, Plaintiff vaguely asserts that unnamed coworkers, at unspecified times, and in unspecified locations, tended to complain (at most once a week) about responding to so many calls." (*Id.*) Defendant argues that "[e]ach alleged comment generally pertains to a desire to perform less work" and "none of these alleged comments were directed specifically at, nor did they explicitly reference or mention, Plaintiff, or any other Native American coworker." (*Id.*) Defendant argues that "[t]aken as true, the general nature of the comments Plaintiff alleges are, at most, rude," "[b]ut comments that are deemed as merely rude, teasing, or boorish are not sufficient to form the basis for a hostile work environment." (*Id.* at 16.) Next, Defendant argues that the FAC also "does not allege that the comments were pervasive enough to plausibly establish a hostile work environment claim" because "Plaintiff alleges he heard the inappropriate remarks on a weekly basis before February 2024" but "[c]omments made within the statute of limitations—after March 6, 2024—occurred even less frequently . . . on an approximately 'monthly' basis." (*Id.*)

In response, Plaintiff argues that "factual challenges to the severity or pervasiveness of a plaintiff's allegations regarding hostile work environment are not appropriate at the pleadings stage . . . because the determination of whether racially motivated conduct is severe and pervasive and whether a work environment is sufficiently abusive raises questions that are best evaluated in light of an evidentiary record." (Doc. 17 at 13, cleaned

up.) Plaintiff argues that, with just one exception, "every case Defendant cites that grants or affirms dismissal of a hostile work environment claim was decided at the summary judgment stage," and "[t]he sole case decided at the pleadings stage involved bare allegations that an investigation was 'hostile and unfair.'" (*Id.* at 13-14, citation omitted.) Plaintiff argues "[t]hat is simply not the case here" because all of his "allegations, taken together as true, are sufficiently severe to state a hostile work environment claim." (*Id.* at 14.) Specifically, Plaintiff argues that the FAC "pleads, in detail, the nature of the Comments to which he has been subjected on at least weekly basis (under the continuing violations doctrine), since he began his employment"; "pleads he has been nit-picked, micromanaged, and had his performance negatively affected"; "pleads that he feels humiliation, ridicule, abuse, and devastation towards him and his culture because of this behavior"; and "pleads that he has had to 'interfere with' or alter his own work performance and schedules solely to avoid the racially hostile work environment." (*Id.*) Plaintiff argues that "[a]t the pleadings stage, this is sufficient." (*Id.*)

In reply, Defendant argues that the FAC "contains very little factual detail and instead relies upon generalized grievances with little in the way of specifics." (Doc. 20 at 8.) Defendant argues that "even taking those generalized grievances as true, they do not support a claim that the working environment was sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment" because "[t]he discriminatory comments Plaintiff alleges were largely general complaints about the nature of the work at [Defendant]," and given that "approximately 60% of the calls from the Show Low Base came from Native American Reservations," "[i]t . . . follows that employees would complaint about responding to calls and wishing that there were fewer calls to respond to." (*Id.*) Defendant also argues that "the general, unspecified comments Plaintiff alleges in the [FAC] do not qualify as racial epithets, cursing, or offensive language" and "were not directed at Plaintiff." (*Id.* at 9.) Defendant argues that "[a]t most, the comments Plaintiff alleges may be considered boorish," "[b]ut courts have routinely held that such comments do not rise to the level of severe or pervasive behavior sufficient to support a hostile work

environment claim." (*Id.*)

B. **Analysis**

"To prevail on a hostile workplace claim premised on . . . race . . . , a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), as amended (Jan. 2, 2004). *See also Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (same elements for a national origin-based hostile work environment claim). Hostile work environment claims brought under Title VII and § 1981 are subject to the same standard. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797-98 (9th Cir. 2003) (prima facie case for hostile work environment under Title VII and § 1981 are the same).

Defendant challenges only the third element—whether the unwelcome verbal conduct of a racial nature alleged by Plaintiff was sufficiently severe or pervasive. "To determine whether conduct was sufficiently severe or pervasive . . . we look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez*, 349 F.3d at 642 (cleaned up). "In addition, the working environment must both subjectively and objectively be perceived as abusive." *Id.* (cleaned up).

The alleged hostile work environment here is premised on an array of different incidents. For example, the FAC alleges that when Plaintiff was hired, he was "directed . . . to cut his hair . . . despite . . . adher[ing] to company grooming standards" and that Defendant "only dropped its directive . . . after [Plaintiff] and his New Hire Educators reported their concerns." (Doc. 8 ¶¶ 17-18.) Although the FAC doesn't explicitly explain how this incident relates to Plaintiff's Native American race/national origin/ancestry, drawing all facts and inferences in favor of Plaintiff, many Native American cultures have beliefs and/or traditions related to long hair, and thus it is plausible to interpret Defendant's

directive to Plaintiff to cut his hair despite meeting company grooming standards as targeting his Native American beliefs and culture.

The FAC also alleges that Plaintiff has been subjected to "discriminatory comments and conduct" that fall into four general categories: "(1) comments and conduct relating to how [Defendant] should not respond to Native American Reservations; (2) comments and conduct relating to how Native Americans do not require air medical transportation; (3) comments and conduct relating to how Native Americans are more difficult to care for; and (4) comments and conduct relating to how Native Americans are violent, including comments and conduct about how Native Americans should not be able to own guns, which would control the number of gunshot calls to Reservations that [Defendant] receives and 'help control them better.'" (*Id.* ¶ 28.) One plausible reading of the FAC is that these comments by Plaintiff's coworkers suggested or implied that Native Americans are unworthy of medical treatment, difficult to deal with, and violent. The FAC alleges that these comments were made on a weekly basis during the period when Plaintiff worked at the Show Low Base—i.e., they occurred weekly from December 27, 2021 through January or February 2024—and have persisted on at least monthly basis since Plaintiff moved to the Safford Bases. (*Id.* ¶¶ 4, 25, 27.) Although these comments may not be particularly severe—as Defendant emphasizes, they are not overt racial epithets—they were (and continue to be) frequent and consistent rather than isolated. *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) ("[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); *La Puebla v. Mayorkas*, 2024 WL 3874230, *1 (9th Cir. 2024) ("This means that a single incident would need to be 'extremely severe' to establish a violation of Title VII, and inversely, where there are many alleged incidents, each one need not individually be as severe to establish a violation.") (citation omitted). Because the comments (1) occurred on at least a weekly basis for over two years, (2) would have continued to occur on a weekly basis had Plaintiff not altered his own work schedule to avoid them, and (3) continue, even now, on at least a monthly basis despite Plaintiff's avoidance, a reasonable juror could find

the comments sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. *See, e.g.*, *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073-74 (9th Cir. 2005) ("We . . . reject Defendants' contention that Young's conduct was not frequent or pervasive enough to create a hostile work environment. . . . Although Young's conduct may not have been especially severe, there was unrefuted evidence of its frequency and pervasiveness. . . . Despite El-Hakem's continued objections, Young persisted in calling El-Hakem 'Manny' once a week in the Monday marketing meeting for approximately two months, and in e-emails at least twice a month thereafter. The conduct continued for almost a year . . . . Because these incidents were frequent and consistent rather than isolated, a reasonable juror could conclude that El-Hakem's work environment was hostile.").

The FAC also alleges that in summer of 2024, Plaintiff observed a company training video that instructed viewers to "be an Indian," and the non-Native American speaker in the video "tries to skip out on taxes by moving his company to a Native American Reservation." (Doc. 8 ¶ 23.) Drawing all inferences in favor of Plaintiff, the company training video can plausibly be interpreted as implying that Native Americans are opportunists who don't contribute to tax-paying society.

The FAC also alleges that in September 2024, Plaintiff heard his supervisors "discussing [Defendant's] efforts to intentionally and strategically minimize or abstain from service or patient call response to the White Mountain Apache Reservation, calling service to the White Mountain Apache Reservation a 'misuse of resources.'" (*Id.* ¶ 35.) Again, drawing all reasonable inferences in favor of Plaintiff, this comment can plausibly be interpreted as implying that Native Americans are unworthy of medical treatment.

The FAC also alleges that in February 2025, Plaintiff's coworker stated in his presence "that she wished another fire would start and 'burn the town' so she would no longer have to respond to medical calls from Native American reservations." (*Id.* ¶ 45.) The coworker's comment was referring to a "July 2024 Watch Fire, which destroyed homes and displaced many Native American families, including [Plaintiff's]." (*Id.*) This comment, which suggests that Native Americans should die in a fire, is perhaps the most

severe of Plaintiff's allegations.

At least at the pleading stage, these allegations, taken together and accepted as true, are sufficient for a reasonable factfinder to conclude that the comments and conduct to which Plaintiff was subjected were sufficiently severe or pervasive to alter the conditions of his employment and create a hostile work environment. *See, e.g.*, *Pringle v. Wheeler*, 478 F. Supp. 3d 899, 915 (N.D. Cal. 2020) ("To the extent that Wheeler factually challenges the severity or pervasiveness of Pringle's allegations, this argument is not appropriate at the pleadings stage."); *Brown v. Contra Costa Cnty.*, 2014 WL 1347680, *7 (N.D. Cal. 2014) ("The determination of whether racially motivated conduct is severe and pervasive and whether a work environment is sufficiently abusive raises questions that are best evaluated in light of an evidentiary record.").[8]

Finally, there is no merit to Defendant's argument that Plaintiff's Title VII hostile work environment claim fails because the frequency of the comments decreased before March 6, 2024, i.e., 300 days before Plaintiff filed his first EEOC charge. As noted in earlier portions of this order, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile

[8] To the extent Defendant argues that the challenged statements were not severe or pervasive because they were not directed at Plaintiff, that argument is unavailing. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) ("[I]f racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff."); *Kishaba v. Hilton Hotels Corp.*, 737 F. Supp. 549, 554 (D. Haw. 1990), *aff'd*, 936 F.2d 578 (9th Cir. 1991) ("Even if Plaintiff herself was never the object of racial harassment, she might nevertheless have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."). And to the extent Defendant argues that Plaintiff's hostile work environment claims fail because Plaintiff does not "allege who made these comments, when they were made, or where they were made" (Doc. 16 at 15), that argument is also unavailing. *See, e.g.*, *Hubbell v. Snowflake, Inc.*, 2026 WL 2339167, *5 (D. Or. 2026) ("Although the complaint lacks details about which coworkers made the offending statements and when . . . viewing the allegations in the light most favorable to Hubbell, she alleges that her coworkers' statements occurred repeatedly throughout her employment and that the specific comments are examples of the offensive she endured. Based on those allegations, the court can reasonably infer that more coworker comments may exist but were not specifically identified in the complaint. Additionally, when conduct is alleged to be pervasive, a plaintiff need not plead specific dates of the offending conduct. Thus, Hubbell has alleged more than a few isolated incidents of sex-based harassment by her coworkers.") (citations omitted).

environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

IV. <u>§ 1981 Discrimination (Count Four)</u>

A. **The Parties' Arguments**

Defendant argues that "[f]or each of the alleged discriminatory acts raised in the [FAC], Plaintiff's allegations are insufficient to show that *but for* his race/ancestry, he would not have been subjected to the employment actions which he is challenging in this lawsuit." (Doc. 16 at 10.) As for the denial of Plaintiff's request for overtime shifts, Defendant argues that the FAC "alleges that overtime shifts were awarded on a first come, first serve basis, and that he was told when he submitted his request that the overtime shifts 'had already been picked up.'" (*Id.*, quoting Doc. 8 ¶¶ 52-53.) Additionally, Defendant emphasizes that the FAC "further alleges that, in addition to having already been requested by another coworker, other operational considerations favored giving overtime shifts to the coworkers instead of Plaintiff," and thus, "by his own allegations, Plaintiff did not receive the overtime shifts for reasons other than his race/national origin." (*Id.* at 10-11.) As for the denial of the full 10% pay raise, Defendant argues that the FAC's allegation "that the 'performance-based criteria' was based on a 'rigged' system aimed at capping Plaintiff's performance metrics" is a "conclusory allegation[]" that is "insufficient to state a claim under Section 1981's but-for causation requirement." (*Id.* at 11.) As for not receiving a grief counselor, Defendant argues that the FAC "does nothing more than make threadbare allegations that [Plaintiff] did not receive a grief counselor while other, non-Native American coworkers did." (*Id.*) Defendant also argues that, "[l]ikewise, Plaintiff falsely asserts 'upon information and belief' that [Defendant] provides substandard medical care to Native Americans," and that "even if" that "false and offensive" allegation "were true, it fails to support a claim of discrimination" because "Plaintiff admits in his [FAC] that the purported 'substandard' level of care provided to Native Americans which he complains of in his [FAC] is attributable to the fact that the recipients of this care 'are either [AHCCCS] or Medicare/Medicaid patients, for whom the cost of recoupment to

[Defendant] is lower.'" (*Id.*, quoting Doc. 8 ¶ 31.)

In response, Plaintiff argues that "[t]he thrust of Defendant's argument for dismissal of [his] Section 1981 discrimination claim (Count IV) rests on a faulty premise." (Doc. 17 at 10.) Plaintiff argues that "[r]ace is not barred from being a 'but-for cause' . . . simply because Plaintiff[] allege[s] that Defendant[] provided [him] with illegitimate, pretextual explanations for the [adverse action]." (*Id.*, citation omitted.) Plaintiff contends that "if the Court were to accept Defendant's argument, a plaintiff who pleads pretext could never state a claim." (*Id.*) Plaintiff argues that the FAC "specifically pleads that Defendant's proffered reason for denying the overtime shifts—the 'first-come/first-serve' basis—was pretextual for at least three reasons": (1) "the supervisor who denied the shifts was friendly with at least two of the individuals [Plaintiff] has reported for discrimination"; (2) "the supervisor 'shifted' the pretextual rationale from 'first-come/first-serve' to 'operational considerations'"; and (3) "the 'operational considerations' themselves were pretextual" because Plaintiff "was granted a shift by a new-hire supervisor on a different base four hours away." (*Id.*) Next, Plaintiff argues that the FAC "also pleads that Defendant's denial of the full (allegedly) performance-based pay raise was pretextual for at least three reasons": (1) Plaintiff "had met all enumerated performance criteria for the pay raise"; (2) "Defendant inserted inaccurate comments 'rigged' to cap his metrics"; and (3) after Plaintiff "emailed HR explaining that he met the performance criteria but felt he had been denied the pay raise because of his consistent complaints, . . . HR never responded." (*Id.* at 11.) Next, Plaintiff argues that the FAC's "allegations plausibly support the inference that he has consistently been denied grief counselors specifically since the Fall of 2024, after he began complaining about the issue to his supervisor," and that "his supervisors, at the same time, overtly discussed discrimination against Reservations." (*Id.*) Plaintiff argues that "[t]his fact, together with the fact[] that [he] is one of three Native American employees in Arizona despite half of the patient care calls coming from Reservations, plausibly 'suggest a causal connection' between [his] complaints and his supervisors' actions (or lack thereof)." (*Id.*, citation omitted.) Last, "with respect to [his] allegation of

Defendant's intentional substandard care to Native Americans," Plaintiff argues that "the allegation attributing that denial partially to healthcare costs is specifically linked to race" and that "Defendant's own case law also dooms this claim." (*Id.*)

In reply, Defendant argues that "Plaintiff misstates the burden required to adequately state a claim for relief under Section 1981." (Doc. 20 at 5.) Defendant argues that "Plaintiff's allegations are plainly insufficient to show that but for his race/ancestry, he would not have been subjected to certain employment actions." (*Id.* at 6.) Defendant reiterates that "[i]n every instance, Plaintiff's allegations include independent, non-discriminatory reasons for the actions taken." (*Id.*) "Regarding his denial for overtime shift requests," Defendant argues that "Plaintiff conceded that they were awarded on a first come, first serve basis, and that he was told when he submitted his request that the overtime shifts 'had already been picked up.'" (*Id.*, quoting Doc. 8 ¶¶ 52-53.) Defendant argues that "[o]n another occasion, [Defendant] took operational considerations into account when determining what overtime shifts to award." (*Id.*) Similarly, Defendant argues that "Plaintiff acknowledges that 'performance-based criteria' led to him receiving a 5% rather than the 10% increase which he desired." (*Id.*) Defendant argues that "[t]aken together, all of Plaintiff's allegations supporting his Section 1981 claim constitute a theory that Plaintiff's race/ancestry were motivating factors for the alleged discrimination, not that they were the but-for reasons for discrimination," and "[b]y Plaintiff's own account, [Defendant] had other legitimate, non-discriminatory factors for its employment decisions." (*Id.*)

B. **Analysis**

"Section 1981 offers relief when racial discrimination impairs a contractual relationship." *Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1034 (D. Ariz. 2021), *aff'd*, 2022 WL 474170 (9th Cir. 2022). "To plausibly allege a § 1981 claim, a plaintiff 'must show intentional discrimination on account of race.'" *Id.* (quoting *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989)). "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."

*Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 589 U.S. 327, 341 (2020) (holding that Title VII's lesser "motivating factor" test does not apply to § 1981 claims). Because but-for causation is required, "[i]f a complaint identifies independent non-discriminatory reasons for an alleged contractual impairment, a § 1981 claim is rendered implausible." *Takieh*, 515 F. Supp. 3d at 1035 (cleaned up).

As for Plaintiff's failure to receive the full 10% pay raise, had Plaintiff simply alleged that he was denied the full raise both because of his race and because of performance issues, he would have failed to plausibly plead but-for causation. *See, e.g.*, *Astre v. McQuaid*, 804 F. App'x 665, 667 (9th Cir. 2020); *Takieh*, 515 F. Supp. 3d at 1035. The FAC, however, pleads that the performance-based reasons proffered by Defendant were "pretextual" because Defendant inserted "inaccurate commentary about [Plaintiff's] performance" into his performance evaluation to "cap[] [his] performance metrics." (Doc. 8 ¶ 38, 84.)

In *B&S Glass, Inc. v. Del Metro*, 2021 WL 3268360 (D.D.C. 2021), the defendants moved to dismiss the plaintiffs' § 1981 discrimination claim, arguing "that discrimination cannot have been a 'but-for cause' of the contract's termination because Plaintiffs plead[ed] multiple explanations for the cancellation." *Id.* at *8. The court disagreed, distinguishing "two cases cited by Defendants in support of this argument" on the ground that, in those cases, "the *plaintiffs* provided non-discriminatory reasons for the defendants' cancellation of a contract," whereas in *B&S Glass*, the plaintiffs alleged that *the defendants* had given "multiple non-discriminatory explanations for the cancellation." *Id.* The plaintiffs in *B&S Glass* further "contend[ed] that Defendants' true motivation to not pay the Plaintiffs [was] because of their race." *Id.* (cleaned up). Under those circumstances, the court held that "[r]ace is not barred from being a 'but-for cause' of the contract's cancellation simply because Plaintiffs allege that Defendants provided them with illegitimate, pretextual explanations for the termination." *Id.*

Similarly, here, the non-discriminatory reason identified in the FAC as to why Plaintiff did not receive the full 10% pay raise was the performance-based reason proffered

by Defendant. The FAC further that this performance-based reason was pretextual because the performance review system was rigged and because Plaintiff's performance review contained "inaccurate commentary about [his] performance." (Doc. 8 ¶ 38.) Indeed, the FAC alleges that Plaintiff "satisf[ied] . . . each of the four criteria for the full 10% pay raise" but was denied the full pay raise "as a further—but escalated—act of discrimination against him on the basis of his Native American race, national origin, and/or ancestry." (*Id.* ¶¶ 38, 40.)[9] Because the FAC alleges that Defendant's proffered performance-based reason was pretextual, and the FAC does not identify any other non-discriminatory reason for Plaintiff's failure to receive the full 10% pay raise, the FAC sufficiently alleges but-for causation as it relates to the pay raise.[10]

V. <u>Title VII And § 1981 Retaliation (Counts Three and Six)</u>

A. **The Parties' Arguments**

Defendant argues that "Plaintiff's retaliation claims should be dismissed because any connection between his alleged protected activity and an adverse employment action [is] too attenuated in time to support a causal nexus." (Doc. 16 at 12.) Specifically, Defendant argues that "Plaintiff alleges he did not receive the top 10% pay raise in November 2024 because he opposed discrimination when he complained to Human Resources in April 2023," but "Plaintiff's April 2023 complaint to Human Resources falls well beyond the 300-day statute of limitations for Title VII claims and cannot be considered on that basis alone." (*Id.* at 12-13.) Defendant further argues that "more importantly, the April 2023 complaint to HR was made more than a year and half before Plaintiff received the 5% pay increase," and "[s]uch extended length of time breaks the causal nexus for a retaliation claim." (*Id.* at 13.) Defendant argues that "[a]lthough the Ninth Circuit has not adopted a bright line rule, courts have generally found a lapse of three to five months or

---

[9] The FAC also alleges that Plaintiff was denied the full pay raise as an act of retaliation for his reports of discrimination. This type of alternate pleading is permissible under Rule 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

[10] This conclusion renders it unnecessary to address whether Plaintiff's § 1981 discrimination claim plausibly alleges but-for causation with respect to (1) the failure to give Plaintiff overtime shifts and (2) the failure to provide Plaintiff with grief counselors.

more to be too remote to support an inference of causation," and "[t]hus, a year and a half between the purported protected activity and the adverse employment action is clearly insufficient to meet the causation standard for a retaliation claim." (*Id.*) "In addition to lacking temporal proximity," Defendant argues that "Plaintiff's retaliation claim should be dismissed because he does not allege plausible facts that support the but-for causation requirement for retaliation claims." (*Id.*) Specifically, Defendant argues that "[s]ince [Defendant] used objective performance metrics to determine how bonuses were calculated, Plaintiff's April 2023 complaint to Human Resources cannot be the but-for reason for his less than 10% pay raise." (*Id.*) Next, Defendant argues that "[t]o the extent Plaintiff alleges he was denied overtime shifts in July 2025, his retaliation claims similarly fail to plausibly allege but-for causation" because "Plaintiff alleges that shifts were distributed on a first-come, first-serve basis, which is precisely what Plaintiff alleges happened in this instance." (*Id.* at 13-14.) Last, Defendant notes that "Plaintiff additionally appears to allege that the shift supervisor who denied his extra shift requests had retaliatory intent not because of any protected activity on the part of Plaintiff, but because the shift supervisor previously dated another coworker about whom Plaintiff had complained," but "[s]uch a tenuous connection is insufficient to allege retaliation." (*Id.* at 14.)

In response, Plaintiff incorporates his arguments "with respect to Defendant's argument that he fails to support 'but-for' causation with respect to his retaliation claims because he pleaded pretext." (Doc. 17 at 12.) Next, as for temporal proximity, Plaintiff argues that he "repeatedly complained informally to his supervisors between April 2023 and the present (again, the same supervisors who overtly discussed discrimination against Reservations in Fall 2024, right around the time [Plaintiff] was denied the pay raise)." (*Id.* at 12-13.) Plaintiff argues that "[i]nformal complaints to an employee's supervisor can constitute protected activity under Title VII" so long as the employee "reasonably believe[s] that the complained-of conduct fairly falls within the protections of Title VII to constitute protected activity for the purposes of a retaliation claim." (*Id.* at 13, citation omitted.) Plaintiff argues that "[t]here is no question that [the FAC] alleges, or at least

supports the inference that, [Plaintiff] reasonably believed his complaints constituted protected activity." (*Id.*)

In reply, Defendant argues that "Plaintiff leans heavily on the fact that he complained to Human Resources in April 2023, and that he suffered an adverse employment action by not receiving the full 10% performance-based pay raise in Fall 2024," but "the April 2023 complaint to Human Resources falls well outside the applicable 300-day statute of limitations and should not be considered on that basis alone." (Doc. 20 at 7, cleaned up.) Defendant reiterates that "Plaintiff's alleged protected activity in April 2023 occurred more than a year and a half before Plaintiff received a 5% pay increase" and further reiterates that "[s]uch an extended length of time breaks the causal nexus for a retaliation claim." (*Id.*) As for Plaintiff's subsequent, informal complaints to supervisors, Defendant argues the FAC "does not specify when he complained, the nature of his complaints, or to whom he complained." (*Id.*, citations omitted.) Defendant argues that "[s]uch vague and general allegations are plainly insufficient to support a Section 1981 or Title VII retaliation claim." (*Id.*) Next, Defendant argues that "Plaintiff also fails to address in his Response how the alleged protected activity was connected to the alleged adverse employment actions Plaintiff claims to have suffered." (*Id.*) "Regarding his overtime shifts," Defendant argues that "Plaintiff does not connect animus from the shift supervisor to any of the complaints Plaintiff made to HR other than a reference to a former girlfriend who made allegedly concerning statements." (*Id.*) Moreover, Defendant argues that "Plaintiff concedes in his [FAC] that he was denied shifts for the perfectly plausible reason that by the time he had submitted them, they were already picked up or that operational considerations played a role in the decision making." (*Id.* at 7-8.) Thus, Defendant argues that the FAC "lacks any plausible connection sufficient to allege retaliation, let alone the but-for causation required to state an actionable claim under Title VII or Section 1981." (*Id.* at 8.)

B. **Analysis**

"To make out a prima facie case of retaliation" under Title VII, Plaintiff "must

establish that [1] he undertook a protected activity under Title VII, [2] his employer subjected him to an adverse employment action, and [3] there is a causal link between those two events." *Vasquez*, 349 F.3d at 646 (brackets added). The Ninth Circuit analyzes retaliation claims under § 1981 using the same three-factor analysis. *Surrell v. Calif. Water Serv. Co.*, 518 F.3d 1097, 1107-08 (9th Cir. 2008). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). *See also Bagley v. Bel-Aire Mech. Inc.*, 647 F. App'x 797, 800 (9th Cir. 2016) (requiring but-for causation for § 1981 retaliation claim). "[I]n some cases, causation can be interfered from timing alone where an adverse employment action follows on the heels of protected activity. But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the [adverse employment action] must have occurred fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (cleaned up).

Defendant challenges the temporal proximity between Plaintiff's April 2023 report to Human Resources and the denial of his full 10% pay raise in November 2024. (Doc. 16 at 12.) Defendant overlooks that the FAC alleges that after Plaintiff "was silenced by Human Resources" following his April 2023 report, he continued to "periodically report his concerns and complaints about the inappropriate and discriminatory comments . . . informally to his supervisors." (Doc. 8 ¶ 34.) Count Three and Count Six both allege that "Defendant intentionally retaliated against [Plaintiff]" for, among other things, making these informal complaints to supervisors. (*Id.* ¶¶ 79, 97.) Informal complaints about discrimination can constitute protected activity. *See, e.g.*, *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (holding that the plaintiff's "informal complaints" to her supervisor "constitute[d] a protected activity" for purposes of Title VII retaliation claim); *Ray v. Henderson*, 217 F.3d 1234, 1240 n. 3 (9th Cir. 2000) ("Making an informal complaint to a supervisor is . . . a protected activity.");

*Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (holding that "informal complaints to supervisors about purportedly discriminatory activity are . . . protected activity" under Title VII and § 1981).[11] The FAC alleges that Plaintiff made these periodic informal complaints to supervisors "through the Fall of 2024" (Doc. 8 ¶ 34) and that he was denied the full pay raise in November 2024 (*id.* ¶¶ 36-37). Even if this somewhat imprecise time estimate[12] is construed in the least favorable light to Plaintiff, such that the last informal complaint occurred on the very first day of the "Fall of 2024" (i.e., on September 1, 2024), this was still less than three months before the denial of the full pay raise. Such temporal proximity is sufficient to allege a causal connection between the protected activity and the adverse action. *See, e.g.*, *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Proximity in time is apparent on the record . . . . The first series of transfers of job duties between August 1979 and February 1980 began less than three months after he filed his first administrative complaint."); *Bellesfield v. Mountain View Tours Inc.*, 2020 WL 209929, *3 (D. Ariz. 2020) ("The Ninth Circuit generally requires temporal proximity of less than three months between the protected activity and the adverse employment action for the employee to establish causation based on timing alone.") (cleaned up).

To the extent Defendant argues that the FAC's allegation that Plaintiff continued to "periodically report his concerns and complaints between April 2023 and Fall 2024" fails to satisfy *Iqbal* because the FAC "does not specify . . . the nature of his complaints, or to whom he complained" (Doc. 20 at 7), that argument is without merit. Paragraph 34 alleges, albeit in a somewhat summary fashion, the subject matter of these complaints ("the inappropriate and discriminatory comments [described elsewhere in the FAC] to which he was directly subjected on a monthly, if not more, basis at the Safford Base") and the recipients of these complaints ("his supervisors"). (Doc. 8 ¶ 34.) These allegations are not

[11] Defendant does not appear to dispute that Plaintiff believed his complaints constituted protected activity.

[12] *Smith-Thompson v. D.C.*, 657 F. Supp. 2d 123, 136 (D.D.C. 2009) ("[T]he plaintiff's failure to specify in her complaint the precise dates of her involvement in protected activity does not warrant dismissal of her complaint at this juncture.").

the sort of fact-free conclusions that *Iqbal* forbids. Accordingly, Plaintiff has done enough at this stage to adequately allege causation through temporal proximity.[13]

Alternatively, Defendant argues that Plaintiff's retaliation claims should be dismissed because "he does not allege plausible facts that support the but-for causation requirement for retaliation claims." (Doc. 16 at 13.) With respect to the pay raise specifically, Defendant argues that "[s]ince [Defendant] used objective performance metrics to determine how bonuses were calculated, Plaintiff's April 2023 complaint to Human Resources cannot be the but-for reason for his less than 10% pay raise." (*Id.*) Setting aside that this argument ignores Plaintiff's informal complaints through the fall of 2024, Defendant's argument also fails for the same reason it failed with respect to Plaintiff's § 1981 discrimination claim—Plaintiff has plausibly alleged that the performance-based reasons proffered by Defendant were pretextual.[14]

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss (Doc. 16) is **denied**.

Dated this 9th day of September, 2026.

Dominic W. Lanza
United States District Judge

---

[13] To the extent Defendant argues in its reply brief that "Plaintiff also fails to address in his Response how the alleged protected activity was connected to the alleged adverse employment actions Plaintiff claims to have suffered" (Doc. 20 at 7), because Plaintiff's denial of the full 10% raise "follow[ed] on the heels" of his informal complaints, "causation can be inferred from timing alone." *Villiarimo*, 281 F.3d at 1065.

[14] Because Plaintiff has sufficiently alleged a causal connection with respect to his retaliation claims premised on the failure to pay him the full 10% raise, it is unnecessary to address the sufficiency of the causal connection with respect to the other alleged adverse employment actions.